**CITY OF CANADIAN v. GUTHRIE.**

No. 3839.

Court of Civil Appeals of Texas. Amarillo.

June 8, 1932.

Rehearing Denied July 6, 1935.

W. D. Fisher, of Canadian, for appellant.

Hoover, Hoover & Cussen, of Canadian, for appellee.

HALL, Chief Justice.

Guthrie was engaged in hauling in the city of Canadian, in which occupation he used a wagon and team. One of the animals so used is described as a "bay mare, one-eyed, about 12 or 14 years old. That this mare, by reason of the loss of her said eye, which plaintiff alleges to be the left eye, was specially adapted to the work of teaming in connection with the other horse." It appears that on account of the

dearth of vitamins from A to Z in her home cuisine, this particular mare was prone to spend her off nights prowling through the city, feasting upon the lawns, shrubbery, and gardens of her neighbors. Some days before the fatal day she had been placed in the city pound, plaintiff was duly notified and failed to pay her board bill, whereupon the city marshal employed one Jess, whose surname was Lemley, more familiarly known as "Panhandle Pete," who, at the direction of the mayor, ruthlessly took said mare's life by shooting her between the bad eye and the one not so bad. In other words, in the vernacular of gangland, when Panhandle Pete's pistol popped, she petered, for which the poundkeeper paid Pete a pair of pesos. The mayor testified that just before her execution he visited the city pound twice to see her and found her in bad shape, that she was sick and prostrate, and had hay and other provender in her nose. That he cleaned out her flues so she could breathe, but, nevertheless, he called out the militia and ordered Pete to put her out of her misery for humanitarian reasons. This established the corpus delicti. His honor testified that he knew nothing about mares, and the jury believed him.

There is testimony that she was thin in flesh, indicating that she had some fine points upon which her harness could be hung. From the record, we conclude that although she may not have had a skin you would particularly love to touch (though she had seen only fourteen joyous summers), yet she had a skin which clung like ivy to her rafters with a beautiful corrugated effect upon the sides of her lithe and spirituelle form.

Plaintiff immediately brought suit, fixing his actual damages at $50, alleging that his mare had no market value, and proudly averring that she was the only mare of her kind in Hemphill county, but that $50 was her actual and intrinsic value, and $100 was her sentimental value. He further sued for $350 for the loss of the services of said mare while pursuing his occupation of hauling, and claimed the further sum of $500 as exemplary damages on account of the malicious act of the city in having her killed. He averred that because of her loss his occupation, like Othello's, was gone and he "had been set out an empty." However, he concluded before the trial that a genial, brotherly-love city like Canadian, which had been converted into a one-horse town by Pete and the mayor, was incapable of harboring malice, and the claim for exemplary damages was abandoned at the trial.

Plaintiff testified that usually he kept her confined in a four-wire corral. The chain of title discloses that Mike Nolan at one time was her proud possessor, and sold her to Mr. Flowers for twelve pieces of silver, payable in installments of two pieces per month. The abstract of title further shows that Flowers sold her to Guthrie, the plaintiff herein, but, according to Flowers' testimony, he had never received even a thin dime of the purchase money since he transferred possession. The testimony of Flowers and the plaintiff conflict upon this issue, but since the title is not involved in this action, that matter is "dismissed for want of jurisdiction," because we do not know what else to do with it.

The record shows that upon at least two occasions

"When night drew her sable curtain down
    And pinned it with a star,"

and

"Silence like a gentle spirit
    Brooded o'er a still and pulseless world,"

the time lock on her corral mysteriously went off and so did she, in search of tulips, dahlias, and gladioli in the neighboring lawns and flower beds. It is clear from the record that she had at least one eye for the beautiful, and was excessively fond of flowers, but that the tender passion was not reciprocated, for, as stated, he parted with her without consideration. While her origin is shrouded in mystery, her appetite for flora of the rarest and costliest varieties indicates that somewhere back in the line of her ancestry there had been injected a stream of royal blood. Although she had only one eye, appellant contends she could find more edible shrubbery in a single night than an experienced landscape gardener could replant in thirty days. We may assume that in her midnight excursions she had been thrown with porch climbers, joy riders, orchard raiders, and other nocturnal prowlers, which may account for her waywardness and utter disregard for the property rights of others. But after her midnight banquet upon orchids, delphiniums, and hyacinths, the poundkeeper would take her in charge, and set before her a bundle or two of mildewed sorghum of the vintage of 1927

in order to take the taste out of her mouth, but when he sent the meal ticket to the plaintiff, the latter steadfastly refused to pay. It was not denied that she had "went hence" and was cut down in the heyday of her young and fitful life because the mayor found some of the hay in her nose, and he admitted that he was accessory before the fact and had personally ordered her gentle soul sent to the great beyond and the remainder to the municipal dump ground.

▮ While, as bearing upon her sentimental value, it is saddening to know that the beautiful flower beds and onion patches of Canadians, over which she was wont to gambol in the moonlight between the hour when

"Curfew tolled the knell of parting day,"

and some hours later,

"when greyeyed morn
Stood tiptoe upon the misty mountain height
And flecked the eastern hills with rays of golden light,"

would know her no more forever, nevertheless, in the cold unsympathetic eye of the law, sentimental value is not recognized as a basis for damages. 13 Tex. Jur. 155.

A jury was impaneled, who found: (1) That the mare had an intrinsic value; (2) of $25; (3) that plaintiff suffered special damages; (4) which were the proximate result of the city's unlawful act; (5) in the sum of $35. The court defined "proximate cause" in the stereotyped form, and charged the jury that special damages "are such consequences of an injury as are peculiar to the circumstances and conditions of the injured party." Judgment was rendered in favor of Guthrie for $60, with interest from the date of the judgment at 6 per cent.

▮ The city demurred to the petition generally and specially to the item of special damages based upon the loss of the use of the mare by plaintiff in his business as a drayman. This demurrer should have been sustained, and the court's action in overruling it presents fundamental error. Damages occasioned by the loss of the use and hire of an animal are recoverable where the animal is injured so that it cannot be used for a time, or where the possession is illegally detained; but no such damages are recoverable for the total loss

or death of an animal. The measure of damages in the case of a wrongful killing of an animal is its market value, if it has one, and if not, then its actual or intrinsic value, with interest. 17 C. J. 795, 876, 879; Galveston, H. & S. A. Ry. Co. v. Matula (Tex. Sup.) 19 S. W. 376; Galveston, H. & S. A. Ry. Co. v. Turner, 1 White & W. Civ. Cas. Ct. App. § 641; International & G. N. Ry. Co. v. Carr (Tex. Civ. App.) 91 S. W. 858.

Appellee's counsel suggested that this being the rule, it is cheaper to kill a mare in Texas than it is to cripple her. The same seems to be true with reference to men, but this court must declare the law as it exists. An eminent Ex Chief Justice of this state doubtless had this in mind when his eloquent pen wrote:

"For nothing so bespeaks a people as their notions of justice. There jurisprudence, comprising those ideas, is the supreme expression of their moral convictions. In it their very character is indelibly written, and hence by it they are to be truly judged.

"That is why I have said that the jurisprudence of Texas embodies the spirit of the Commonwealth. And because it does, is the source of a just pride. It has ever been a spirit valiant, bold and free. As it flamed with an imperishable glory at the Alamo, at Goliad and at San Jacinto, so it has lived and has imparted its virtue to the jurisprudence of the State." 1 Tex. Jur. xxvii.

After the item of $500 claimed as exemplary damages (which, of course, was not recoverable) had been abandoned by plaintiff, the trial court should have sustained the general demurrer to the item of $350 special damages, as the real amount in controversy is only $50, alleged to be the actual value of the mare.

▮ In our original opinion, we held that because the actual damages fixed at $50 was an amount below the jurisdiction of the county court, that that court had no jurisdiction, and therefore this court acquired none by the appeal, and we dismissed the cause. We suggested that as the plaintiff's mare was wont to stray into the wrong curtilage for nourishment, likewise his attorneys had wandered into the wrong court in search of damages. In the light of the motion for rehearing, it appears that that was an unjust criticism of learned counsel, but it is far worse as a legal

proposition, because, as counsel say in their motion for rehearing:

## I.

"Comes now the plaintiff, appellee,
And moves this Honorable Court to see,
That House Bill Number 304
Threw open wide the Court House door,
Of County Court in Hemphill County
Where Guthrie sought relief and bounty,
And recompense and generous meed,
For his departed wayward steed,
Cut down in all her youthful pride,
When she was taken for a ride."

## II.

"The court did hold, that as this mare,
To wrong curtilage did repair,
Likewise, these lawyers who here do pray,
Into the wrong court below did stray;
But this Honorable Court overlooked the fact,
That the Legislature passed an Act,
In Nineteen Hundred and Fifteen,
And Jurisdiction since has been,
In that Court whence this case came,
As in the Justice Court the same."

Reference to H. B. No. 304 (Laws 1915, c. 125) shows that the Legislature did extend the jurisdiction of the county court of Hemphill county, making it concurrent with the jurisdiction of justices' courts, a law which even this court did not know; but appellee's counsel have found too much law for his good, because section 3 of the act provides that no appeal shall be taken to the Court of Civil Appeals from any final judgment of said county court in civil cases of which said court has concurrent jurisdiction with the justices' court where the judgment or amount in controversy does not exceed $100, exclusive of interest and costs. The judgment as stated is $60. According to the allegations, the real amount in controversy is $50.

In Spencer v. Davis (Tex. Civ. App.) 298 S. W. 443, 446, it is said: "In the case before us it appears upon the face of appellant's petition that he has an action for nominal damages and no more. In other words, the face of his petition discloses that he has no substantial right in the cause of action declared. That he places his damages at a sum within the jurisdiction of the district court does not aid the legal conclusions flowing from the facts pleaded. * * * In the case before us the damages claimed on the facts pleaded by plaintiff cannot be recovered, as a matter of law. His statement that by the acts pleaded he was damaged in the sum claimed is only a conclusion of the pleader, which, on the face of his petition, has no support in law."

In answering a certified question in City of Fort Worth v. Zanecetti, 29 S.W.(2d) 958, 962, the Commission of Appeals said: "However, if the petition upon its face shows that the plaintiff would not be entitled to recover under the law an amount within the jurisdiction of the court, then he has no cause of action that could be asserted in that tribunal, and the rule laid down by our Supreme Court in the case of Telegraph Co. v. Arnold, 97 Tex. [365] 373, 77 S. W. 249, 79 S. W. 8, would govern."

It follows from these decisions that the county court had jurisdiction, but no appeal could be prosecuted to this court. It therefore becomes our duty to dismiss the appeal.

Appellee generously offers to enter a remittitur of the item of $35 awarded him in the trial court. Since we have no jurisdiction of the appeal, we cannot enter the remittitur here nor pass upon any of the interesting questions presented in the able and exhaustive briefs of counsel. The original opinion is withdrawn, and the appeal is dismissed.