J & D TOWING, LLC, Petitioner,

v.

## AMERICAN ALTERNATIVE INSURANCE CORPORATION, Respondent

### NO. 14-0574

Supreme Court of Texas.

Argued September 22, 2015

OPINION DELIVERED: January 8, 2016

---

Elizabeth Ryan, Waco, TX, Kevin Knight, Attorney at Law, for Petitioner.

Aaron Mark Pool, Ian Corey Hernandez, Donato, Minx, Brown & Pool, P.C., Houston, TX, for Respondent.

JUSTICE WILLETT delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE GUZMAN, JUSTICE LEHRMANN, JUSTICE BOYD, JUSTICE DEVINE, and JUSTICE BROWN joined, and in Parts I, II.B, III.C, and IV of which JUSTICE JOHNSON joined.

Nearly a century ago, a Texas attorney argued that the rule at issue in this case made it "cheaper to kill a mare in Texas than it is to cripple her."[1] No American Pharoah[2] herself, this one-eyed, underfed mare lived a simple life.[3] One night, however, she was caught roaming the city streets in search of food and was placed in the city pound.[4] Her owner failed to pay her board bill.[5] Thus, the city marshal hired a man known as Panhandle Pete to put her out of her misery.[6] As the court of appeals then put it, "when Panhandle Pete's pistol popped, she petered, for which the poundkeeper paid Pete a pair of pesos."[7] Her owner protested her death and sued for damages, including $350 for the loss of her services in his occupation of hauling.[8] The court rejected that claim, holding that although "[d]amages occasioned by the loss of the use and hire of an animal are recoverable where the animal is *injured*," "no such damages are recoverable for the *total loss or death* of an animal."[9] Rather, "[t]he measure of damages in the case of a wrongful killing of an animal is its market value, if it has one, and if not, then its actual or intrinsic value, with interest."[10] That rule, the owner's attorney responded, makes it "cheaper to kill a mare in Texas than it is to cripple her."[11]

1. *City of Canadian v. Guthrie*, 87 S.W.2d 316, 318 (Tex.Civ.App.—Amarillo 1932, no writ). The attorney's choice of words was likely an attempt to invoke the old adage "It is better to kill than to maim." *See Baker v. Bolton* (1808) 170 Eng. Rep. 1033, 1033; 1 Camp. 493, 493 (widely recognized as the source of the adage); *see also* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 127, at 945 (5th ed. 1984) [hereinafter PROSSER AND KEETON] (explaining "[t]he result [of an English common-law rule denying tort recovery for injury once the victim had died *and* the *Baker* rule refusing to recognize an independent cause of action in the victim's dependents and heirs for their loss] was that it was cheaper for the defendant to kill the plaintiff than to injure him").

2. *See, e.g.*, Joe Drape, *American Pharoah Wins Belmont Stakes and Triple Crown*, NEW YORK TIMES (June 6, 2015), http://www.nytimes.com/2015/06/07/sports/american- pharoah-wins-belmont-stakes-and-triplecrown.html?_r=0 (explaining how "American Pharoah became the first horse since 1978 to sweep the Triple Crown").

3. *See City of Canadian*, 87 S.W.2d at 316–17.

4. *Id.* at 317.

5. *Id.*

6. *Id.*

7. *Id.*

8. *Id.*

9. *Id.* at 318 (emphasis added).

10. *Id.*

11. *Id.*

This case places a modern twist on that rule and addresses whether it should be cheaper to totally destroy a truck than it is to partially destroy it. J & D Towing, LLC (J & D) lost its only tow truck when a negligent motorist collided with the truck and rendered it a total loss. The question presented is simply put: In addition to recovering the fair market value of the truck immediately before the accident, may J & D recover loss-of-use damages, such as lost profits?

American Alternative Insurance Corporation (AAIC) says no and the court of appeals below agreed. Relying upon holdings of other Texas courts of appeals and cases from this Court, they contend that Texas law distinguishes between *partial* destruction and *total* destruction of personal property, allowing loss-of-use damages for the former but not for the latter. J & D counters that this distinction belies common sense and is out of step with the majority trend in other jurisdictions permitting loss-of-use damages in total-destruction cases.

We agree with J & D and, therefore, reverse the court of appeals' judgment and render judgment for J & D.

I

The relevant facts are undisputed. J & D is a towing company owned by Robert Davis in Huntsville, Texas. In 2011, J & D owned only one tow truck, a 2002 Dodge 3500 purchased in April 2011 for $18,500. On December 29, 2011, Davis went to repossess a vehicle. As he drove down Highway 75, a car struck the passenger side of his truck. Both parties in this case stipulated that the negligence of the driver of that car, Cassandra Brueland, was the sole proximate cause of the accident. The parties also stipulated that the accident rendered the truck a total loss.

After the accident, J & D began to negotiate a settlement with Brueland's insurer. On January 12, 2012, Brueland's insurer offered to settle J & D's property-damage claim for $10,299.12 if J & D retained the truck or $16,715.61 if the insurer retained the truck. Believing the truck was worth between $19,000 and $20,000 at the time of the accident, J & D refused to accept the settlement offer. On February 29, 2012, Brueland's insurer settled with J & D for $25,000, the policy limit for property damage. Around March 8, 2012, J & D used that money to purchase another truck and resumed its business.

J & D then filed a claim with AAIC under an underinsured-motorist policy issued by AAIC, requesting compensation for the loss of use of the truck. He claimed that the funds from the settlement with Brueland's insurer were insufficient to compensate him for these damages, rendering Brueland an underinsured motorist. At the time of the accident, the AAIC policy provided:

> We will pay damages which an "insured" is legally entitled to recover from the owner or operator of an "uninsured motor vehicle" because of "bodily injury" sustained by an "insured" or "property damage" caused by an "accident". The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the "uninsured motor vehicle".

AAIC denied the claim and cancelled the policy.

J & D thereafter sued AAIC to recover "any and all loss of use damages to which [it] may be entitled." J & D presented to a jury various calculations of the loss-of-use damages J & D claimed it incurred between December 29, 2011, and March 8, 2012. Aggregating the totals of those calculations, J & D asked the jury to award

loss-of-use damages in the sum of either $27,866.25 or $29,416.25, with the difference being whether the jury awarded damages for a nine-week period or a ten-week period.

AAIC presented no evidence at trial. Instead, AAIC challenged the availability of loss-of-use damages in its motion for summary judgment and motion for an instructed verdict. AAIC's argument may be summarized as follows: (1) its underinsured-motorist policy only offers to pay J & D damages that J & D is "legally entitled" to recover; (2) Texas law does not permit recovery of loss-of-use damages in total-destruction cases; (3) it is undisputed that J & D's truck was totally destroyed; therefore, (4) J & D is not legally entitled to recover loss-of-use damages; and (5) AAIC is not obligated to pay under the policy. The trial court denied both motions.

At the conclusion of the trial, the only question submitted to the jury concerned the proper amount of loss-of-use damages. AAIC again objected on the ground that Texas law does not permit loss-of-use damages in total-destruction cases, and the trial court overruled that objection. The jury awarded J & D $28,000. After the jury returned its verdict, the trial court held a brief hearing to determine the amount of the credit to which AAIC was entitled in light of the settlement with Brueland's insurer. The court concluded that J & D's truck was worth $19,500 at the time of the accident, and thus AAIC was entitled to a credit of $5,500—the amount of the settlement with Brueland's insurer that did not cover the value of the truck but instead partially compensated J & D for its loss-of-use damages. AAIC filed a motion for judgment notwithstanding the verdict, not disputing the amount

of the damages award, but raising only the same legal arguments it made in its prior motions. The trial court denied that motion and entered judgment for J & D in the amount of $22,500 plus interest and court costs.

AAIC appealed and raised three issues: (1) whether Texas law on total-destruction cases permitted the trial court to submit the loss-of-use-damages question to the jury; (2) whether the trial court correctly denied AAIC's JNOV motion; and (3) whether J & D could recover under the policy "where its legally recoverable damages do not exceed the limits of [Brueland's] liability coverage." Aside from its position that it is not obligated to pay *any* amount of loss-of-use damages, AAIC did not challenge the amount of damages awarded to J & D. AAIC's arguments under each of the issues presented distilled down to AAIC's position that Texas law does not permit loss-of-use damages in total-destruction cases. The court of appeals agreed, holding that the trial court abused its discretion in submitting the question to the jury and erred in denying the JNOV motion.[12] The court of appeals, therefore, reversed and rendered judgment for AAIC.[13]

J & D then appealed to this Court, raising an argument that sounds in fairness and common sense: Texas law permits loss-of-use damages in partial-destruction cases, and the same should be true in total-destruction cases. The court of appeals' distinction, J & D claims, is not only illogical but is also against the great weight of jurisdictions that have eliminated that archaic distinction. For its part, AAIC reprises the purely legal argument it made to the court of appeals: Because J & D's truck was totally destroyed and

---

12. 446 S.W.3d 41, 47.

13. *Id.*

Texas law prohibits loss-of-use damages in total-destruction cases, J & D is not "legally entitled" to recover loss-of-use damages and the AAIC policy is not triggered. As in the court of appeals, AAIC does not challenge the amount of loss-of-use damages awarded to J & D.

We reverse and render judgment for J & D.

## II

■ We begin with first principles. Compensation is the chief purpose of damages awards in tort cases.[14] Indeed, we have long held that "[t]he basic reason underlying rules for the ascertainment of damages for any tortious act is a fair, reasonable, and proper compensation for the injury inflicted as a proximate result of the wrongful act complained of."[15] Reasonable and proper compensation must be neither meager nor excessive, but must be sufficient to place the plaintiff in the position in which he would have been absent the defendant's tortious act.[16] In this way, compensation through actual-damages awards functions as "an instrument of corrective justice, an effort to put the plaintiff in his or her rightful position."[17]

■ Actual damages may be either direct or consequential.[18] Direct damages compensate for a loss that is the necessary and usual result of the tortious act.[19] By contrast, consequential damages, also known as special damages, compensate for a loss that results naturally, but not necessarily, from the tortious act.[20] Although consequential damages need not flow necessarily from the act, they must be both foreseeable and directly traceable to the act.[21] If the purported consequential damages are "too remote, too uncertain, or purely conjectural, they cannot be recovered."[22]

■ Loss-of-use damages are often appropriately couched in terms of consequential damages.[23] By design, loss-of-use damages compensate a property owner for

14. *See Smith v. Sherwood*, 2 Tex. 460, 464 (1847) (affirming generally that the object in tort cases is to give compensation to the party injured for the actual loss sustained); 4 FOWLER V. HARPER ET AL., HARPER, JAMES AND GRAY ON TORTS § 25.1, at 574 (3d ed. 2007) [hereinafter HARPER, JAMES AND GRAY] ("The cardinal principle of damages in Anglo–American law is that of *compensation* for the injury caused to the plaintiff by the defendant's breach of duty.").

15. *Pasadena State Bank v. Isaac*, 149 Tex. 47, 228 S.W.2d 127, 128 (1950).

16. *See Nelson v. Krusen*, 678 S.W.2d 918, 924–25 (Tex.1984).

17. 1 DAN B. DOBBS, LAW OF REMEDIES § 3.1, at 281 (2d ed. 1993) [hereinafter DOBBS, LAW OF REMEDIES (2d)].

18. *See, e.g., Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex.2007) (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex.1997)).

19. *Id.* (citing *Arthur Andersen*, 945 S.W.2d at 816).

20. *Id.* (citing *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 163 (Tex.1992) (Phillips, C.J., concurring)).

21. *Arthur Andersen*, 945 S.W.2d at 816 (citing *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex.1981); *Airborne Freight Corp., Inc. v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 295 (Tex.App.—El Paso 1992, writ denied)).

22. *Id.* (citing *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex.1983); *Bynum*, 836 S.W.2d at 164 (Phillips, C.J., concurring)).

23. *See, e.g., Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 121 (Tex.App.—Houston [1st Dist.] 2011, no pet.) ("[L]ost use damages are frequently, but not categorically, consequential in nature."); DOBBS, LAW OF REMEDIES (2d) § 5.15(1), at 874 ("Special or consequential damages usually fall into one of three categories: (1) loss of use. . . . ").

damages that result from "a reasonable period of 'lost use" of the personal property.[24] The amount of damages may thus be measured according to the particular loss experienced, such as the amount of lost profits, the cost of renting a substitute chattel, or the rental value of the owner's own chattel.[25]

■ Where personal property has been only *partially* destroyed, Texas law is clear as to direct and loss-of-use damages. The default rule for measuring direct damages is "the difference in the market value immediately before and immediately after the injury to such property at the place where the damage was occasioned."[26] But this rule is not absolute. For example, where it would be economical and reasonable to repair the property, "the owner of the injured property may [instead] recover the reasonable costs of such replacements and repairs as are necessary to restore the damaged article to its condition immediately prior to the accident."[27] Additionally, whether the owner recovers direct damages under the default rule or otherwise,[28] the owner may recover loss-of-use damages, such as the "pecuniary loss of the use of an automobile damaged in a collision."[29]

---

**24.** DOBBS, LAW OF REMEDIES (2d) § 5.15(1), at 875.

**25.** *Id.*; HARPER, JAMES AND GRAY § 25.7, at 676.

**26.** *See Pasadena State Bank v. Isaac,* 149 Tex. 47, 228 S.W.2d 127, 128 (Tex.1950); *see also Tex. & Pac. Ry. v. Levi & Bro.,* 59 Tex. 674, 679 (1883) ("The ordinary measure of damage for injury to property is the difference between the value of that damaged before the damage was done and its value after the injury to it ... and this at the place where the injury occurs.... ").

**27.** *Pasadena State Bank,* 228 S.W.2d at 128. Although we stated in that case that the owner "may" recover repair and replacement costs instead of the difference in market value, we have not addressed in this context whether the owner may elect either option or must recover only the lesser amount. In a different context, addressing damages for temporary and permanent damage to real property, we recently recognized the "economic feasibility exception," which limits the owner to the lesser amount of damages when necessary to avoid overcompensation. *See Gilbert Wheeler, Inc. v. Enbridge Pipelines (East Texas), L.P.,* 449 S.W.3d 474, 481–82 (Tex.2014). We need not and do not address that issue in the personal-property context today.

**28.** Some courts have permitted loss-of-use damages *only if* a plaintiff opts to recover the cost of repairs. *See, e.g., Carson v. Bryan,* 532 S.W.2d 711, 713 (Tex.Civ.App.–Amarillo 1976, no writ); *Tex. Farm Bureau Mut. Ins. Co. v. Wilde,* 385 S.W.3d 733, 737 (Tex.App.— El Paso 2012, no pet.). But we have made clear:

> Where a person is entitled to a judgment for harm to chattels not amounting to a total destruction in value, the damages include compensation for
>> (a) the difference between the value of the chattel before the harm and the value after the harm *or,* at the plaintiff's election, the reasonable cost of repair or restoration where feasible, with due allowance for any difference between the original value and the value after repairs, *and*
>> (b) the loss of use.

*Pasadena State Bank,* 228 S.W.2d at 128–29 (quoting 4 RESTATEMENT (FIRST) OF TORTS § 928 (Am. Law Inst.1939) [hereinafter RESTATEMENT (FIRST) OF TORTS] (quotation marks omitted and emphasis added). In other words, in a partial-destruction case (as distinct from a total-destruction case), a plaintiff may recover loss-of-use damages not only if the plaintiff elects to recover the cost of repairs, but also if the plaintiff recovers under the default measure of damages—the difference between the value of the chattel immediately before and after the injury. Therefore, any rule limiting the availability of loss-of-use damages for partial destruction of personal property to a case where a plaintiff elects to recover the cost of repairs is incorrect.

**29.** *Pasadena State Bank,* 228 S.W.2d at 128–29.

■ Where personal property has been *totally* destroyed,[30] however, Texas law is less clear. As an initial matter, the measure of direct damages is the fair market value of the property immediately before the injury at the place where the injury occurred.[31] But we have not yet directly spoken on loss-of-use damages in total-destruction cases. Despite that lack of guidance, some Texas courts of appeals have held that loss-of-use damages are unavailable in total-destruction cases, but other courts of appeals have seriously questioned the validity of that rule.

## A

The caselaw of this Court bears the indelible mark of the story of Texas. It is a story of grit and perseverance. A courageous but ill-fated stand at the Alamo,[32] a Palm Sunday massacre at Goliad,[33] and finally, a decisive defeat of Santa Anna at San Jacinto[34]—all monumental moments that culminated in our triumphant birth as a young republic. But our story is not unblemished, for our early triumphs were overshadowed by the then-pervasive stain of slavery. Indeed, it was in part Texas's status as a slave state that complicated its annexation into the Union,[35] and it was slavery that eventually prompted Texas to secede from the Union.[36]

30. For purposes of Texas tort law, "total-destruction" may be considered a legal fiction when a vehicle is a "total loss." A vehicle is a "total loss" when "it would not be absolutely impossible to repair it, but the damages are so extensive that repair would not be economically feasible." *Morrison v. Campbell*, 431 S.W.3d 611, 617 (Tex.App.—Fort Worth 2014, no pet.). In that circumstance, the law treats a total-loss vehicle as totally destroyed subject to the total-destruction measure of damages, and thus "[a] totally destroyed vehicle compared to a total loss vehicle is essentially a distinction without a difference[.]" *Id.* Though AAIC has not raised this issue here, the liable party may well be entitled to a credit in the amount of the salvage value of the total-loss vehicle if the owner retains the vehicle.

31. *See Tex. & Pac. Ry.*, 59 Tex. at 679 ("The ordinary measure of damage for injury to property is ... in so far as property is wholly destroyed, its value, and this at the place where the injury occurs.... "); *Morrison*, 431 S.W.3d at 614 ("In a suit for damages for personal property that has been totally destroyed, the proper measure of damages is the fair market value of the property at the time it was destroyed."); *Hartford Ins. Co. v. Jiminez*, 814 S.W.2d 551, 552 (Tex.App.—Houston [1st Dist.] 1991, no writ) (same); *Am. Jet, Inc. v. Leyendecker*, 683 S.W.2d 121, 128 (Tex.App.—San Antonio 1984, no writ) (same); *see also* 4 RESTATEMENT (SECOND) OF TORTS § 927(1)(a) (Am. Law Inst.1979) [hereinafter RESTATEMENT (SECOND) OF TORTS] (articulating the measure

as "the value of the subject matter or of his interest in it at the time and place of the conversion, destruction or impairment").

32. *See* WALTER LORD, A TIME TO STAND 104, 142 (1961) [hereinafter LORD, A TIME TO STAND] (containing refrains of the Texans' refusal to surrender, such as Colonel Travis's "I answered them with a cannon shot" and "[U]nder the flag of independence, we are ready to peril our lives a hundred times a day").

33. *See* JAKIE L. PRUETT & EVERETT B. COLE, SR., GOLIAD MASSACRE 109–20 (1985) (detailing firsthand accounts of that fateful day when Texas captives were marched to their deaths).

34. *See* LORD, A TIME TO STAND, at 195–97 (stating that "[t]here was nothing quite like the fury of those eighteen minutes" of battle).

35. *See* ANDREW C. MCLAUGHLIN, A CONSTITUTIONAL HISTORY OF THE UNITED STATES 501–02 (1935) ("[T]hough the issue was not distinctly between freedom and slavery, and was not distinctly sectional, the fact remains that annexation was opposed by many at the north because of opposition to the extension of slaveholding territory, and the movement for annexation came more and more to be looked upon as a movement for the advancement of slaveholders' interests.").

36. *See* RUPERT NORVAL RICHARDSON ET AL., TEXAS 222–27 (4th ed. 1981) (explaining the sharp discourse on maintaining slavery in Texas that led to secession); *see also* THE LAWS OF

It is understandable then that, in a pre-Emancipation era when slavery was permitted and slaves were considered personal property,[37] one of this Court's earliest decisions on the availability of loss-of-use damages concerned a slave. In the 1852 case *Pridgin v. Strickland*, the Court considered whether an amended petition that reframed the relief sought tainted a judgment for the plaintiff and compelled reversal.[38] The plaintiff owned a slave named Ben and alleged that the defendant converted—that is, wrongfully possessed[39]—Ben.[40] The plaintiff initially requested damages for conversion of Ben, then three years later, amended his petition to demand possession of Ben and the loss of use of Ben's labor.[41] A jury awarded the plaintiff $800 for the value of Ben and $450 in specific damages for the loss of use of his labor.[42] Before this Court, the defendant argued that the amendment introduced a new cause of action barred by a statute of limitations.[43]

This Court disagreed with the defendant and affirmed the judgment, explaining that the plaintiff could have recovered those damages under the initial pleading. The Court began by attributing "all the embarrassment thrown around this case" to "an attempt to engraft the common-law forms of action upon our system, when it is so clear, and has been so often announced in judicial opinions, that [these forms are not] known to our forum."[44] Rather, the rule is simple: Where "the damage is immediate and not too remotely consequential, [the damages awarded] should be commensurate with the injury sustained[.]"[45] Nor are damages limited to the value of the personal property at the time of conversion and prejudgment interest. For example, where a workman's tools are converted, he may recover not only the value of his tools at the time of conversion and prejudgment interest on that value, but also "such amount as the jury might believe from the evidence would be more adequate to the loss he sustained in being deprived of their use in the exercise of his trade."[46] So too here, the Court reasoned, the owner of a slave "would be allowed to recover not only his value but damages for the value of his services from the time of the demand up to the time of the trial[.]"[47]

After *Pridgin*, the Court frequently revisited the principle of full and fair compensation through loss-of-use damages. For example, in *Craddock v. Goodwin*, we repeated the maxim that "[t]he thing to be kept in view is that the party shall be compensated for the injury done."[48] To

---

SLAVERY IN TEXAS 5 (William S. Pugsley & Marilyn P. Duncan comps., Randolph B. Campbell ed., 2010) [hereinafter THE LAWS OF SLAVERY IN TEXAS] ("Sectional conflict over slavery led Texas to secede from the United States in February 1861 and join the Confederate States of America.").

**37.** *See* THE LAWS OF SLAVERY IN TEXAS, at 1 ("The institution of African slavery as practiced in the antebellum United States depended on the ownership of humans as chattels, pieces of movable personal property.").

**38.** 8 Tex. 427 (1852).

**39.** *Conversion*, BLACK'S LAW DICTIONARY (10th ed. 2014).

**40.** *Pridgin*, 8 Tex. at 427.

**41.** *Id.* at 427–28.

**42.** *Id.* at 428.

**43.** *Id.* at 428–30.

**44.** *Id.* at 433–34.

**45.** *Id.* at 434.

**46.** *Id.* at 434–35 (citing *Shotwell v. Wendover*, 1 Johns. 65 (N.Y.Sup.Ct.1806) (per curiam)).

**47.** *Id.* at 435.

**48.** 54 Tex. 578, 588 (1881).

be sure, where personal property has been converted, "the usual measure of damages is the value of the property taken, and interest."[49] Nonetheless, "this rule must vary with the character and uses of the property."[50] There, animals were wrongfully taken, and we stated:

> We think no more equitable rule can be adopted in determining the plaintiffs' actual damages than to allow in any event, if plaintiffs made out a case for actual damages, an amount not less than the value of the property, with interest to the time of trial; but the jury should also take into consideration the value of the use or hire of the animals seized for the whole time of which the plaintiffs have been deprived of them, and allow such an amount for actual damages as will compensate the plaintiffs, whether computing it by the rule of interest or that of hire or value of the use, as may seem to them most adequate to that result.[51]

More recently, in *Luna v. North Star Dodge Sales, Inc.,* we squarely addressed the measure of loss-of-use damages in the context of a deceptive-trade-practice claim.[52] Plaintiff Luna demanded compensation for loss-of-use damages that she incurred during the period of time that a car dealership retained her car for repairs and refused to refund her purchase money.[53] She could not afford to rent a replacement car, and thus, she sought to recover the reasonable rental value of her car, which she valued at approximately $100 per week.[54] The court of appeals set aside an award of loss-of-use damages on the ground that Luna "did not prove she had actually incurred some monetary loss by renting an automobile or expending monies for alternative transportation."[55] We reversed, holding that "in order to prove loss of use of an automobile, the plaintiff need not rent a replacement automobile or show any amounts actually expended for alternative transportation."[56] Citing *Craddock,* we explained that the period of compensatory loss of use is the period of deprivation of the loss of use of the automobile, and the actual measure "may be a reasonable rental value by the day, week, or month."[57] That measure of course is not "rigid and unbending," for it must necessarily "vary with the character of the property, and somewhat with the peculiar circumstances of the case."[58] And above all, we reiterated, *"[t]he thing to be kept in view is that the party shall be compensated for the injury done."*[59]

At the broadest level of abstraction, this line of cases is instructive concerning our approach to loss-of-use damages where personal property has been *taken* —permitting loss-of-use damages flows directly from the commonsense understanding that adequate compensation for an injury depends upon the nature of the property at issue and the circumstances of the case. These cases, however, do not directly address the more specific question of wheth-

49. *Id.* at 587.

50. *Id.*

51. *Id.* at 588.

52. 667 S.W.2d 115 (Tex.1984).

53. *Id.* at 116–18.

54. *Id.* at 118.

55. *Id.*

56. *Id.*

57. *Id.* at 119 (citing *Craddock v. Goodwin,* 54 Tex. 578 (1881)).

58. *Id.* (quoting *Craddock,* 54 Tex. at 588).

59. *Id.* (quoting *Craddock,* 54 Tex. at 588 (emphasis added)).

er loss-of-use damages should be available in cases where personal property has been either partially or totally *destroyed*.[60]

Perhaps it is for that reason that AAIC and the court of appeals below invoked our 1950 decision in *Pasadena State Bank v. Isaac*, which set forth guidance on the proper damages measure in partial-destruction cases.[61] The property at issue in that case was an electrical accounting machine owned by Pasadena State Bank (Bank).[62] The Bank employed J.B. Isaac to move the machine from one location to another.[63] During the transfer, Isaac's employees mishandled the machine, resulting in damages of $979.39—$600 for new parts and $379.39 for labor and transportation costs related to the repairs.[64] The Bank sued Isaac to recover those damages.[65] At trial, the Bank presented evidence of the repair costs but not of the market value of the machine immediately before and after the injury.[66] The trial court believed it could not render a proper judgment for the Bank because the market value of the machine after its repair might exceed the market value of the machine

immediately before the injury.[67] The court, therefore, held that the Bank could recover nothing from Isaac.[68] The court of appeals reversed only as to the $379.39 of labor and transportation costs, reasoning that those costs did not enhance the value of the machine.[69]

We reversed and rendered judgment for the Bank for the full amount of $979.39.[70] We held that "[w]hen the [Bank] introduced evidence to show the reasonable and necessary cost of restoring the accounting machine, including labor and transportation, to the identical condition it was in immediately prior to the damage thereto, a prima facie case was made out by the plaintiff."[71] After the Bank made that prima facie case for damages, the burden shifted to Isaac to establish that "the repairs, as made, resulted in added value to the article in question."[72] He did not do so.[73] Therefore, the lower courts erred in not awarding the Bank $979.39 in damages.[74]

That holding, however, is not why AAIC and the court of appeals have invoked

---

60. We note, however, that one court has raised the question of whether *Pridgin* sanctions loss-of-use damages in total-destruction cases. *See Reinarz v. Griner*, 401 S.W.2d 274, 275–76 (Tex.Civ.App.–Austin 1966, no writ) ("Neither the parties nor this Court are aware of an authoritative statement by our Supreme Court on this question unless Pridgin v. Strickland, 8 Tex. 427, is such an authority.").

61. 149 Tex. 47, 228 S.W.2d 127 (1950). The court of appeals also cited two other decisions from this Court in support of the proposition that "a chattel owner can recover only the market value of the property, not loss-of-use damages, in a total-loss case." 446 S.W.3d 41, 45 (citing *Thomas v. Oldham*, 895 S.W.2d 352, 359 (Tex.1995); *Waples–Platter Co. v. Commercial Standard Ins. Co.*, 156 Tex. 234, 294 S.W.2d 375, 376–77 (Tex.1956)). Neither decision mentions loss-of-use damages, rendering those decisions inapposite here.

62. *Pasadena State Bank*, 228 S.W.2d at 127.

63. *Id.*

64. *Id.*

65. *Id.*

66. *Id.* at 128.

67. *See id.*

68. *Id.*

69. *Id.*

70. *Id.* at 129.

71. *Id.*

72. *Id.*

73. *See id.*

74. *Id.*

*Pasadena State Bank* in this case. Rather, they rely upon *Pasadena State Bank* for what it says concerning damage calculation where personal property has been damaged. In that discussion, we began with a well-known principle: "The basic reason underlying rules for the ascertainment of damages for any tortious act is a fair, reasonable, and proper compensation for the injury inflicted as a proximate result of the wrongful act complained of." [75] We explained that "[t]he general rule for measuring damages to personal property is the difference in the market value immediately before and immediately after the injury to such property at the place where the damage was occasioned." [76] But we acknowledged that unique factual situations may on occasion alter this rule. For example, the personal property destroyed may lack market value, requiring a different method of determining damages. [77] For the facts then before us, we articulated a possible alternative to the general rule: "In cases where the damaged personal property is susceptible of repairs[,] the owner of the injured property may recover the reasonable costs of such replacements and repairs as are necessary to restore the damaged article to its condition immediately prior to the accident." [78]

That alternative, we said, does not necessarily limit recovery to the cost of replacements and repairs, but may also, pursuant to the *Restatement (First) of Torts*, include loss-of-use damages. [79] Indeed, one example of permissible loss-of-use damages may be the "pecuniary loss of the use of an automobile damaged in a collision." [80]

From that discussion in the partial-destruction context, AAIC and the court of appeals infer a complete bar of loss-of-use damages in total-destruction cases. [81] *Pasadena State Bank* cannot bear that reading. To begin with, the general measure of damages around which we structured our decision—the difference between the market value immediately before and after the injury—is the *partial*-destruction measure of damages. Indeed, the page in the *American Law Reports* that we cited for that general rule confines that measure to partial-destruction cases and distinguishes it from the measure in total-destruction cases. [82] In the same way, our citation to the *Restatement (First) of Torts*, which was the foundation for our discussion of loss-of-use damages, utilized section 928, which applies only where "a person is entitled to a judgment for harm to chattels *not* amounting to a total de-

75. *Id.* at 128.

76. *See id.*

77. *Id.*

78. *Id.*

79. *See id.* at 128–29 (citing RESTATEMENT (FIRST) OF TORTS § 928).

80. *Id.* at 129.

81. *See* Resp't's Br. 16–17 (citing *Pasadena State Bank* as evidence of "more than fifty years of Texas law" prohibiting loss-of-use damages in total-destruction cases); 446 S.W.3d 41, 45 (citing *Pasadena State Bank* for the proposition that "a chattel owner can recover only the market value of the property, not loss-of-use damages, in a total-loss case").

82. *See Pasadena State Bank*, 228 S.W.2d at 128; M.C. Dransfield, Annotation, *Measure of Damages for Destruction of or Injury to Commercial Vehicles*, 169 A.L.R. 1074, 1075 (1947) ("Speaking generally, when personal property is destroyed by the wrongful or negligent act of another[,] the measure of damages recoverable is ordinarily the market value of the property, determined as of the time and place of its destruction, but when personal property is merely damaged or partially destroyed by the act of another[,] the rule for determining the measure of damages is .... the difference between the value of the property immediately before and immediately after the injury[.]").

struction in value." [83]   Moreover, the numerous references to repairs and restoration in *Pasadena State Bank* demonstrate that the decision centered on partial, not total, destruction.[84]  We plainly limited the scope of the opinion to the partial-destruction facts then before us.  Thus, we find no basis in *Pasadena State Bank* or any other case of this Court for barring loss-of-use damages in total-destruction cases.

## B

Several Texas courts of appeals have weighed in on the availability of loss-of-use damages in total-destruction cases, however, resulting in divergent decisions. AAIC and the court of appeals below rightly emphasize that most courts of appeals to consider this question have held that loss-of-use damages are unavailable. The story of the mare that perished at the hand (or pistol) of Panhandle Pete appears to be one of the earliest Texas cases to employ this rule.[85]  Since that decision in 1932, at least six other courts of appeals have expressly stated that, although loss-of-use damages are available in partial-destruction cases, these damages are unavailable in total-destruction cases.[86] Some courts have justified that rule on the ground that loss-of-use damages are "included as a part of the award for total loss"—that is, the award based on the fair market value of the property—and thus permitting additional damages for loss of use would constitute a double recovery.[87] Another court has opined that these courts simply "assume that the [personal property] can be replaced immediately" and thus "a person does not suffer loss of use damages when [personal property] is a total loss."[88]  And these courts have retained the prohibition of loss-of-use damages despite the inequitable results that may flow from the prohibition.  As an example, one court stated that "it matters not that the totally destroyed chattel had not been replaced because the owner had

**83.**  *See* Restatement (First) of Torts § 928 (emphasis added); *see also Pasadena State Bank*, 228 S.W.2d at 128–29.

**84.**  *See Pasadena State Bank*, 228 S.W.2d at 127–29 (mentioning "repairs" and "restoration" 20 times).

**85.**  *See City of Canadian v. Guthrie*, 87 S.W.2d 316, 318 (Tex.Civ.App.–Amarillo 1932, no writ).

**86.**  *See Pickett v. J.J. Willis Trucking Co.*, 624 S.W.2d 664, 668 (Tex.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.) ("When a chattel has been totally destroyed, no additional recovery for loss of use is allowed."); *Cogbill v. Martin*, 308 S.W.2d 269, 271 (Tex.Civ.App.–Waco 1957, no writ) ("*But*, when the chattel is totally destroyed, the measure of damages is the difference in the market value immediately before and immediately after injury, and no additional recovery can be had for loss of use of the chattel while it is being replaced."); *Kan. City S. Ry. v. Frederick*, 276 S.W.2d 332, 334 (Tex.Civ.App.–Beaumont 1955, writ ref'd n.r.e.) (stating that "the correct rule" is

"when the chattel is totally destroyed . . . . no recovery can be had for loss of use of the chattel or personal property in event of total destruction"); *Export Ins. Co. v. Herrera*, 426 S.W.2d 895, 901 (Tex.Civ.App.–Corpus Christi 1968, writ ref'd n.r.e.) ("[W]here the chattel is totally destroyed, no additional recovery may be had for loss of use while the chattel is being replaced."); *Hanna v. Lott*, 888 S.W.2d 132, 139 (Tex.App.—Tyler 1994, no writ) ("It is our understanding of Texas law that if a chattel has been *totally destroyed* as a result of a tort, *no additional recovery* is allowed for the unavailability or loss of use of the property while it is being replaced."); *Am. Jet, Inc. v. Leyendecker*, 683 S.W.2d 121, 128 (Tex.App.—San Antonio 1984, no writ) ("[W]e do not agree that the $20,000 found as 'loss of use' damages was recoverable since the plane was totally destroyed.").

**87.**  *See Am. Jet, Inc.*, 683 S.W.2d at 128 (citing *Riddell v. Mays*, 533 S.W.2d 910, 911 (Tex. Civ.App.–Waco 1976, writ ref'd n.r.e.)).

**88.**  *Mondragon v. Austin*, 954 S.W.2d 191, 195–96 (Tex.App.—Austin 1997, pet. denied).

been unable to provide the financing for a substitute vehicle." [89]

The development of that rule has not escaped criticism from other courts of appeals, however. In 1996, the Third Court of Appeals in *Mondragon v. Austin* referenced in dicta the problem with the assumption that an owner of totally destroyed personal property does not suffer loss-of-use damages because the property can be replaced immediately. [90] The court thought that blanket assumption invalid, because "it may be difficult or impossible to replace the car immediately." [91] Recognizing the unfairness of that rule, the court concluded, "We believe the better policy might be to reconsider permitting loss of use damages in total destruction cases." [92]

Then, in 2014, the Second Court of Appeals broke rank with the majority of the courts of appeals, holding that "loss of use damages should be available when the claimant under an insurance policy cannot replace destroyed property because of the insurer's unreasonable delay in paying the claim." [93] In *Morrison v. Campbell,* the court considered loss-of-use damages in the context of a motorcycle that was rendered a total loss. [94] The court acknowledged the prohibition of loss-of-use damages in total-destruction cases, but nonetheless concluded, "We agree with the *Mondragon* court that we should reconsider whether we should permit loss of use damages in total destruction cases." [95] The court reexamined the possible rationales underlying the prohibition and reit-

erated the *Mondragon* court's concerns that these rationales were flawed. [96] The court then looked to decisions from Hawaii, New Jersey, Iowa, California, Nebraska, and Alaska, all of which concluded "that there is no compelling or logical reason to treat loss of use claims differently.in destroyed property cases than we do in repairable property cases." [97] Adopting that understanding, the court held that, at least when an insurer has unreasonably delayed in paying a claim, a total-destruction plaintiff is entitled to both the fair market value of the property and loss-of-use damages. [98] In the court's view, "a plaintiff in such a case who is not allowed loss of use damages is simply not being made whole." [99]

\* \* \*

■ We, therefore, find ourselves at a crossroads. We have never expressly permitted or prohibited loss-of-use damages where personal property has been totally destroyed, but our general loss-of-use-damages caselaw emphasizes full and fair compensation, which ostensibly cuts in favor of permitting these damages in total-destruction cases. Conversely, most Texas courts of appeals have opted for a prohibition of loss-of-use damages, over the compelling dissenting view that such a prohibition is nonsensical and inequitable. Having concluded that the "exact question presented here has never been decided by this Court" and that the courts of appeals

**89.** *See Hanna,* 888 S.W.2d at 139.

**90.** *Mondragon,* 954 S.W.2d at 195–96.

**91.** *Id.* at 196.

**92.** *Id.*

**93.** *Morrison v. Campbell,* 431 S.W.3d 611, 622 (Tex.App.—Fort Worth 2014, no pet.).

**94.** *Id.* at 612–13.

**95.** *Id.* at 618.

**96.** *Id.* at 614–17.

**97.** *Id.* at 618–22.

**98.** *Id.* at 622–23.

**99.** *Id.* at 623.

are divided on the question, we may "look to other jurisdictions, for guidance in reaching our decision," and we do so now.[100]

## III

It is abundantly clear from both early caselaw and early legal treatises that a majority of jurisdictions within the United States permitted loss-of-use damages in partial-destruction cases, but prohibited loss-of-use damages in total-destruction cases. *Why* that prohibition existed is not as obvious, though some courts referenced the common-law action of trover. But regardless of the theoretical underpinnings of the prohibition, recent caselaw and treatises have shifted away from the prohibition. And the reasons for the shift appear to coalesce around one simple point: The owner of totally destroyed personal property may suffer loss-of-use damages to the same extent that the owner of partially destroyed personal property may suffer loss-of-use damages—permitting the damages in the latter case and not the former is, therefore, illogical.

### A

In the early years of the United States, the availability of loss-of-use damages turned on whether personal property was partially destroyed or totally destroyed. Beginning in the dark era of slavery, that trend grew more pronounced in cases where the destruction of horses and automobiles disrupted their owners' businesses. Early treatises also followed this trend, recognizing and supplementing the agreement in the caselaw.

#### 1

The initial trend of prohibiting loss-of-use damages in total-destruction cases spanned virtually every scenario in the United States where damage to personal property could result in economic damages, from slaves in the antebellum period, to horses, and ultimately, to automobiles. Perhaps one of the earliest, and most deplorable, examples involved a man named Israel. The Scriptures speak of Moses—who would later become a leader of the children of Israel[101]—killing an Egyptian for beating an Israelite slave.[102] In Civil War-era Alabama, however, Israel was himself a slave who died from horrendous beatings.[103] Israel's owner sued the man who killed Israel for damages to his "property." [104] When the case reached the Supreme Court of Alabama, the parties contested the proper damages measure.[105] The jury had been charged that "the measure of damages would be the value of the slave at the time of his death; and that in addition to that value, they may add interest thereon, or *may look to the value and hire both, as a guide to a conclusion.*" [106] The problematic consideration was "hire,"

---

**100.** *Hollins v. Rapid Transit Lines, Inc.*, 440 S.W.2d 57, 59 (Tex.1969). *Cf. City of Gladewater v. Pike*, 727 S.W.2d 514, 524 (Tex.1987) ("In making any decision, we may look to the laws of other states for guidance, but eventually we must always turn to the cases decided by courts of this State.").

**101.** *See Exodus* 3:9–10 (English Standard) (containing God's charge to Moses: "And now, behold, the cry of the people of Israel has come to me, and I have also seen the oppression with which the Egyptians oppress them. Come, I will send you to Pharaoh that

you may bring my people, the children of Israel, out of Egypt.").

**102.** *See Exodus* 2:11–12; *Acts* 7:24.

**103.** *Fail's Adm'r v. Presley's Adm'r*, 50 Ala. 342, 343 (1874).

**104.** *Id.*

**105.** *Id.* at 346.

**106.** *Id.*

which referred to slave labor and the purchase price of that labor—akin to lost profits.[107] The supreme court held consideration of hire was error:

> It is now laid down as the general rule, that where trespass is brought for *the destruction of personal property*, and no circumstances of aggravation are shown, the action is to be regarded as one of trover; and the value of the property, with interest on such value, furnishes the rule for the measure of damages; because, if the owner of the property gets the value of the property destroyed, and interest, this is, in effect, a sale of the property to the defendant, at the price fixed by the jury.[108]

In other words, the defendant "would not be liable for the hire" because "he had paid the market price" of Israel.[109] Permitting the jury to consider the value of Israel's hire was, therefore, incorrect in Alabama.[110]

The prohibition of loss-of-use damages was also on prominent display in cases where workhorses were killed, interrupting their owners' businesses.[111] One example arises from an 1862 accident in Schenectady, New York. The real-world set for the late Philip Seymour Hoffman's performance in *Synecdoche, New York*,[112] Schenectady sits along the southern shore of the Erie Canal. In 1862, two boats collided in the canal just outside of Schenectady.[113] As a result of the collision, a horse that was towing one of the boats drowned.[114] The horse's owner was then en route to Rome, New York, and he arrived in Rome a day late because only three, instead of four, horses continued to tow his boat.[115] The horse's owner sued the other boat owner for negligence and sought damages for the value of the horse and the loss of use of the horse, which he valued at $10—his estimate of the amount

107. *See, e.g., Adamson v. Adamson,* 9 Ark. 26, 31–32 (1848) ("The price of [slave] hire is quite fluctuating, being continually subject to the control of circumstances. The value of the hire for one year is no correct criterion for the ensuing.... [T]he measure of damages would be a reasonable compensation for the hire of the [slaves] during the time they were in the service of the defendant. What such [slaves] are hiring for during that time would be the correct criterion of damages.").

108. *Fail's Adm'r,* 50 Ala. at 346 (emphasis added).

109. *Id.*

110. The Tennessee Supreme Court, in a similar case, appeared to agree with this position. *See Johnson v. Perry,* 21 Tenn. 569, 572 (1841) ("Where the property was actually destroyed, the damages would be the value of the property, and not for any loss of service in the cultivation of a crop, or otherwise; so in this case, if the [slave] had been killed, the damages would have been his actual value[.]").

111. *Compare Churchman v. Kansas City,* 44 Mo.App. 665 (Mo.Ct.App.1891), *and Edwards*

*v. Beebe,* 48 Barb. 106 (N.Y.Sup.Ct.1865) (cases in which loss-of-use damages were prohibited where horses were killed), *with Keyes v. Minneapolis & St. Louis Ry.,* 36 Minn. 290, 30 N.W. 888 (1886), *and Gillett v. W. R.R.,* 90 Mass. 560 (8 Allen) (1864); *Streett v. Laumier,* 34 Mo. 469 (1864), *and S. Ry. v. Gilmer,* 143 Ala. 490, 39 So. 265 (Ala.1905) (cases in which loss-of-use damages were permitted where horses were only injured).

112. *See* Synecdoche, New York (Sidney Kimmel Entertainment 2008); *see also* Carina Chocano, *Review: 'Synecdoche, New York',* Los Angeles Times (Oct. 24, 2008), http://www.latimes.com/entertainment/la-et-synecdoche24-2008oct24-story.html (explaining that "Synecdoche, New York" is "a lilting play on the name of the town of Schenectady, N.Y., where the movie's hero, a melancholy regional theater director named Caden Cotard (Philip Seymour Hoffman), lives").

113. *Edwards,* 48 Barb. at 106.

114. *Id.*

115. *Id.* at 107.

of damages caused by the one-day delay.[116] A referee awarded him $100 for the value of the horse plus $11.60 in interest and $10 for the loss of use of the horse.[117]

A New York court vacated the loss-of-use award, reasoning that "the legal and natural damages [did] not extend beyond" the value of the horse.[118] The court believed that the horse's owner could have purchased another horse in Schenectady or Rome to remedy his loss.[119] The court also believed that "the allowance of interest on the value of the horse would seem to cover" the loss-of-use damages—indeed $11.60 in interest on the value of the horse was more than the $10 awarded for loss of use of the horse.[120] Thus, the court vacated the loss-of-use award, leaving in place only the award based upon the value of the horse plus interest.[121] As other courts made clear, however, the loss-of-use damages would have been permitted if the horse had only been injured and not killed.[122]

And with the historic shift from horse power to horsepower, it is unsurprising that the prohibition of loss-of-use damages had its most common application where automobiles were totally destroyed.[123] A large number of these cases involved automobiles that were struck by trains as the automobiles crossed the railroad tracks.[124] The accidents would invariably result in the total destruction of the automobiles, and the automobile owners would sue the railroad companies for negligence.[125] One such accident involved a plaintiff who "engaged in the business of carrying passengers for hire in its motor coaches or vehicles."[126] When that plaintiff sued the defendant railroad for negligence, the plaintiff sought to amend its complaint to demand loss-of-use damages in the sum of $10,000 that it suffered from being unable to carry passengers in the totally destroyed motor coach.[127] The court in that case denied the motion to amend on the ground that the "[t]he allegation of the complaint is that the coach was so wrecked as to be worthless, and that it was and is entirely and totally destroyed."[128] In its view, "[w]here an injured vehicle may be repaired, then the cost of repairs, together with the loss of use, would be proper elements of dam-

---

116. *Id.* at 106–07.

117. *Id.* at 106.

118. *Id.* at 108.

119. *See id.*

120. *Id.*

121. *Id.*

122. *See, e.g., Keyes v. Minneapolis & St. Louis Ry.*, 36 Minn. 290, 30 N.W. 888 (1886); *Gillett v. W. R.R.*, 90 Mass. 560 (8 Allen) (1864); *Streett v. Laumier*, 34 Mo. 469 (1864); *S. Ry. v. Gilmer*, 143 Ala. 490, 39 So. 265 (Ala.1905) (all cases permitting loss-of-use damages where horses were only injured).

123. *See, e.g., Johnson v. Thompson*, 35 Ohio App. 91, 172 N.E. 298 (Ohio Ct.App.1929); *Terrebonne v. Toye Bros. Yellow Cab Co.*, 64 So.2d 868 (La.Ct.App.1953); *Fuller v. Martin*, 41 Ala.App. 160, 125 So.2d 4 (Ala.Ct.App. 1960), *overruled by Ex parte S & M, LLC*, 120 So.3d 509 (Ala.2012); *German v. Centaur Lime Co.*, 295 S.W. 475 (Mo.Ct.App.1927).

124. *See, e.g., Barnes v. United Rys. & Elec. Co. of Baltimore*, 140 Md. 14, 116 A. 855 (Md. 1922); *Louisville & Nashville R.R. v. Tippenhauer*, 10 Ky.L.Rptr. 401 (Ky.1888); *Crossen v. Chi. & Joliet Elec. Ry.*, 158 Ill.App. 42 (Ill.App.Ct.1910).

125. *See id.*

126. *Colonial Motor Coach Corp. v. N.Y. Cent. R.R.*, 131 Misc. 891, 228 N.Y.S. 508, 510–11 (N.Y.Sup.Ct.1928).

127. *Id.* at 512.

128. *Id.*

ages; but, where the vehicle has been totally destroyed, there should be no allowance of damages for loss of use." [129] And so, that distinction between partially and totally destroyed personal property was often the dispositive rule in these cases.

### 2

Various treatises in the nineteenth ·and twentieth centuries recognized this trend permitting loss-of-use damages only in partial-destruction cases. Theodore Sedgwick's editions of his *Treatise on the Measure of Damages* provide a consistent example. In the eighth edition, section 432 states that "the value of the property, with interest, furnishes the measure of damages." [130] Sections 433 and 434 add that "value" means market value at the time of the "trespass." [131] Section 435 then confines those rules to situations where personal property has been totally destroyed. Entitled "Injury less than destruction," section 435 explains that the proper damages measure for partially destroyed personal property is not fair market value at the time of the injury, but is instead "the difference in value of the property before and after the injury." [132] Section 435 goes further to say that in a partial-destruction case, the plaintiff may recover "compensation for the loss of use of it during the period of disability." [133] What section 435 does *not* expressly say is whether the plaintiff in a total-destruction case may

similarly recover loss-of-use damages. The ninth edition of Sedgwick's treatise clarified that point by adding a new section, section 435a, which expressly limits loss-of-use damages to partial-destruction cases:

> Where an injury to plaintiff's property which does not cause its total destruction results in his losing the use of it for a time, either because it is rendered unfit for use or because he is temporarily deprived of the possession of it, he may in addition to the deterioration in value recover the value of the use of it during the time he lost the use, and the expense of its maintenance, if he was at such expense. *But* if the plaintiff recovers the full value of the property, *as for a complete destruction,* he cannot also recover the value of the use.[134]

Therefore, if there were any doubt as to whether Sedgwick's treatise could be read to permit loss-of-use damages in total-destruction cases, section 435a eliminated that doubt.

Sedgwick's view, in addition to aligning with the caselaw at the time, coincided with the views of many other early treatise authors limiting the availability of loss-of-use damages to partial-destruction cases.

George Field's 1876 treatise states that where personal property is destroyed, "the measure of damages is the value of the property with interest, and *not* the profits which might have been made on

---

129. *Id.* Notably, however, the court did leave open the possibility that the plaintiff *might* have recovered loss-of-use damages "[i]f the proposed amendment had been to the effect that the plaintiff was compelled to buy a coach to replace the one destroyed, and that, during the lapse of time between the date of the accident and the time within which it reasonably could purchase and get delivery of a suitable coach, it had suffered loss of earnings." *See id.* at 512–13.

130. 2 THEODORE SEDGWICK, A TREATISE ON THE MEASURE OF DAMAGES § 432 (8th ed. 1891).

131. *Id.* §§ 433, 434.

132. *Id.* § 435.

133. *Id.*

134. 2 THEODORE SEDGWICK, A TREATISE ON ·THE MEASURE OF DAMAGES § 435a (9th ed. 1912) (footnotes omitted and emphasis added).

the property in addition to its value[.]"[135] But where personal property was only *injured*, Field stated that the measure is "the difference between the value of the [property] before the injury and immediately after, *and* any reasonable expenses incurred[.]"[136] For example, where a horse was injured, recovery of "the value of the services of the horse during his disability" was proper.[137]

Professor Charles McCormick's 1935 treatise similarly provides that "[w]hen personal property is wrongfully destroyed, the normal measure of damages is its value at the time of destruction, with interest."[138] McCormick distinguished this case from a situation where the property is "wrongfully *injured*," in which case "the owner may recover, in addition [to the costs of repair], for the loss of the use of the property during the time necessary for repair."[139] Such loss-of-use damages for a partially damaged vehicle under repair, in McCormick's view, could be calculated by "[t]he ordinary profits that could have been made from the use of the vehicle."[140]

And even as late as 1961, Professor Howard Oleck's treatise dedicated one section to "Deprivation of Use," which expressly forbade loss-of-use damages in total-destruction cases.[141] Oleck generally explained that "if the deprivation is caused by the damaging of the article of property, the measure is the cost of reasonably

prompt repair plus the loss of use."[142] He further urged that the specific circumstances of the case be considered in determining loss-of-use damages.[143] "If, for example, no other car could be obtained, resulting in a loss of profits due to lack of an automobile, a loss of profits may be recovered if it can be proved."[144] But Oleck concluded this section by strictly limiting this damages regime to partial-destruction cases: "If deprivation of use is the result of destruction of the thing, and its full value is recovered, there may *not* also be (a double) recovery of the loss of its use."[145]

The uniformity of this view should not be overstated, however, because the *Restatement (First) of Torts* appears to endorse loss-of-use damages in total-destruction cases. To be sure, the *Restatement* distinguishes between partial and total destruction of personal property.[146] But it also contains two clauses that could be construed as permitting loss-of-use damages in total-destruction cases. The relevant section, section 927, provides:

> Where a person is entitled to a judgment for the conversion of a chattel or the destruction of any legally protected interest in land or other thing, the damages include
>
> (a) the exchange value of the subject matter or the plaintiff's interest therein at the time and place of

---

135. GEORGE W. FIELD, A TREATISE ON THE LAW OF DAMAGES § 781 (1876) (emphasis added).

136. *Id.* § 782 (emphasis added).

137. *See id.* (citing *Streett v. Laumier*, 34 Mo. 469 (1864)).

138. CHARLES T. MCCORMICK, HANDBOOK ON THE LAW OF DAMAGES ch. 19, § 124, at 470 (1935).

139. *Id.* (emphasis added).

140. *Id.* ch. 19, § 124, at 476.

141. HOWARD L. OLECK, DAMAGES TO PERSONS AND PROPERTY § 201 (3d rev. ed. 1961).

142. *Id.*

143. *Id.*

144. *Id.*

145. *Id.*

146. *Compare* RESTATEMENT (FIRST) OF TORTS § 927, *with id.* § 928.

the conversion or destruction, or a different value where that is necessary to give just compensation, and

(b) *the amount of any further loss suffered as the result of the deprivation,* and

(c) interest from the time at which the value is fixed *or compensation for the loss of use.*[147]

Section 927(b) could be plausibly read to account for a circumstance where a plaintiff suffered loss-of-use damages beyond the amount of the fair market value of the personal property—that is, "further loss" suffered. A comment to section 927(b), however, states that "[t]here can be no recovery for the value of the use of the subject matter after the point of time at which the plaintiff has fixed the loss, since in the measure of damages is included interest on the subject matter as well as damages for losses proximately resulting from the loss of use."[148] Thus, any recovery for loss-of-use damages must lie under section 927(c), but that provision forces a plaintiff to select either interest or loss-of-use damages, not both.[149] Under the *Restatement (First) of Torts* then, section 927 is not exactly a resounding endorsement of full and fair compensation, confirming that under these early legal treatises, as under the early caselaw, plaintiffs were hard put to obtain loss-of-use damages in total-destruction cases.

.B

The strength of this trend necessarily begs the question *why.* Why would a trend permitting loss-of-use damages in partial-destruction, but not total-destruction, cases develop? Some courts have speculated without much elaboration that this trend was a result of the common-law action of trover.[150] Our review suggests that although that may have been true in some cases, judicial assumptions and the power of common-law development are the more likely sources of this trend.

1

The action of trover is the ancestor of the action of conversion.[151] Birthed in the late fifteenth century, trover was the remedy for an owner of personal property who lost his property and could not recover it from the finder of the property.[152] The standard allegations in a complaint were straightforward: The plaintiff possessed certain goods, he lost them, the defendant found them, and the defendant converted them to his own use instead of returning them to the plaintiff.[153] That latter requirement, of course, later gave rise to the action of conversion.[154]

Numerous facets of trover made it a plaintiff's preferred remedy. One such aspect was that trover avoided "wager of law," a form of licensed perjury that disadvantaged honest plaintiffs who sued dishonest defendants.[155] Another aspect was that courts began to treat as a fiction the allegations of losing and finding the prop-

---

147. *Id.* § 927 (emphasis added).

148. *Id.* § 927 cmt. l.

149. *Id.* § 927(c).

150. *See Alaska Constr. Equip., Inc. v. Star Trucking, Inc.,* 128 P.3d 164, 168–69 (Alaska 2006); *Long v. McAllister,* 319 N.W.2d 256, 259 (Iowa 1982); *Reynolds v. Bank of Am. Nat'l T. & S. Ass'n,* 53 Cal.2d 49, 345 P.2d 926, 927–28 (Cal.1959).

151. PROSSER AND KEETON § 15, at 89.

152. *Id.*

153. *Id.*

154. *Id.*

155. *Id.*

erty.[156] This meant that a defendant could not deny the losing and finding, and "[w]ith losing and finding no longer essential, trover became the standard remedy for any form of interference with a chattel."[157]

But the most important aspect of trover for our purposes was the *theory* upon which recovery was based. The theory of trover was that the defendant had appropriated the plaintiff's chattel, for which the defendant must pay.[158] Indeed, the plaintiff "recovered as damages the full value of the chattel at the time and place of conversion."[159] The fiction was this: When the defendant satisfied the judgment in trover—that is, paid the full value of the chattel at the time and place of conversion—the title to the chattel then passed to the defendant.[160] The functional effect was, therefore, that the defendant "was compelled, because of his wrongful appropriation, to buy the chattel at a forced sale, of which the action of trover was the judicial instrument."[161]

Thus, when some courts suggest that trover was the foundation for the early prohibition of loss-of-use damages in total-destruction cases, that suggestion undoubtedly had purchase in early cases, particularly those that expressly mentioned trover. Israel's story is a prime example, because there the Supreme

Court of Alabama stated "where trespass is brought for the destruction of personal property, ... the action is to be regarded as one of trover."[162] And in reasoning that Israel's owner could recover only his value and not the value of his hire, the court justified this result on the ground that "if the owner of the property gets the value of the property destroyed, and interest, this is, in effect, a sale of the property to the defendant at the price fixed by the jury"[163]—precisely the theory of recovery in trover. Similarly, Sedgwick argued that when "compensation is asked for destruction, that is, for the whole value of the property, it is upon the theory that the plaintiff's entire interest in the property *ceased* at the time of injury, and was replaced by a right to have the value of the property in money."[164] Thus, in his view, because "the plaintiff no longer has title to the property, he can no longer claim that he might make a future gain from it; and his recovery is limited to the value of the property at the time and place of destruction, with interest."[165] As one commentator later noted, "the courts regarded the full impact of the injury as occurring at the time of the violation, and ignored any subsequent impacts resulting from the loss of the asset."[166]

Nonetheless, understanding the prohibition of loss-of-use damages as *necessarily*

---

**156.** *Id.*

**157.** *Id.*

**158.** *Id.*

**159.** *Id.*

**160.** *Id.*

**161.** *Id.* § 15, at 90.

**162.** *Fail's Adm'r v. Presley's Adm'r*, 50 Ala. 342, 346 (1874).

**163.** *Id.*

**164.** 1 THEODORE SEDGWICK, A TREATISE ON THE MEASURE OF DAMAGES § 178, at 336–37 (9th ed. 1912) (emphasis added). Sedgwick distinguished this case from one in which "injury does *not* extinguish the plaintiff's title" and thus would give the plaintiff "a right to compensation for the loss of any use he might rightfully make of the property." *See id.* (emphasis added).

**165.** *See id.*

**166.** Konrad Bonsack, *Damages Assessment, Janis Joplin's Yearbook, and the Pie–Power Court*, 13 GEO. MASON U.L. REV. 1, 6 (1990).

flowing directly from the action of trover does not seem correct. To begin with, Sedgwick himself recognized that damages in an action of trover were not invariably limited to the fair market value of the personal property plus interest. Describing that measure as "subject to many qualifications," Sedgwick pointed to both English and American cases that implied "special damages may be recovered in this action [of trover] for the detention of the property, *over and above its value.*"[167] Moreover, there were other cases similar to Israel's case, where courts invoked the theory of trover but permitted recovery of the value of hire in addition to the value of the slave.[168] Thus, while some cases may have relied upon the theory of trover to prohibit loss-of-use damages in total-destruction cases, trover is not an altogether convincing explanation for the widespread prohibition of loss-of-use damages that developed in early American caselaw and treatises.

### 2

We think the more plausible explanations for the early prohibition of loss-of-use

damages in total-destruction cases lie in a panoply of judicial assumptions and ultimately the growing tide of common-law development.

One early judicial assumption centered on judicial competency and the speculative nature of loss-of-use damages. In the mid-nineteenth century, Sedgwick's treatise described recovery of special damages as "doubtful" because of "the question as to remoteness or consequentiality of damages."[169] A Kentucky court added to that doubt a concern of judicial competency:

> In an action to recover damages for an injury to property by reason of the negligence of the defendant, the plaintiff can not recover anything on account of his inability to instantly supply himself with other property in lieu of that injured or destroyed. Such damages are too remote to be the subject of judicial ascertainment.[170]

Courts in this camp thus assumed that ascertainment of such damages was necessarily outside the bailiwick of the judiciary.[171]

Another assumption was that awarding loss-of-use damages in addition to fair

---

**167.** THEODORE SEDGWICK, A TREATISE ON THE MEASURE OF DAMAGES 501–02 (3d ed. 1858) [hereinafter SEDGWICK, A TREATISE ON THE MEASURE OF DAMAGES (3d)] (emphasis added); 2 THEODORE SEDGWICK, A TREATISE ON THE MEASURE OF DAMAGES 369, 373 (7th ed. 1880) [hereinafter SEDGWICK, A TREATISE ON THE MEASURE OF DAMAGES (7th)].

**168.** *See Banks v. Hatton,* 10 S.C.L. 221, 222 S.C.1818 ("In the action of trover, the correct measure of damages is the value of the property, and interest thereon; or if the action be for the conversion of [slaves], the value of their *labour,* in addition to the value of the [slaves]."); *Schley v. Lyon,* 6 Ga. 530, 535 (1849) ("The general rule in actions of trover is, that the measure of damages will be the value of the property *at the time of conversion,* with interest thereon from that time.... The rule of damages for the conversion of [slaves], is the value of the property *at the time of*

*conversion,* and the value of their *labor,* in addition to the value of the property from that time.").

**169.** SEDGWICK, A TREATISE ON THE MEASURE OF DAMAGES (3d), at 502; SEDGWICK, A TREATISE ON THE MEASURE OF DAMAGES (7th), at 373–74.

**170.** *See Louisville & Nashville R.R. v. Tippenhauer,* 10 Ky.L.Rptr. 401, 402 (Ky.1888).

**171.** *See, e.g.,* DAN B. DOBBS, LAW OF REMEDIES § 5.11, at 384–85 (1973) [hereinafter DOBBS, LAW OF REMEDIES (1st)] ("A third argument against granting loss of use recovery where a chattel is totally destroyed is that to grant such recoveries opens the door to speculation."). *Cf. Guido v. Hudson Transit Lines,* 178 F.2d 740, 742 (3d Cir.1950) (applying New Jersey law, noting "the plaintiffs' case removed the possibility of speculation by

market value of the totally destroyed personal property would amount to impermissible double recovery. There were countless variations in how courts reached this assumption. One variation was that loss-of-use damages were somehow subsumed in the award of the fair market value of the property.[172] Another variation was that prejudgment interest on the fair market value of the property adequately compensated for any loss-of-use damages.[173] A third variation was that a plaintiff was simply not entitled to loss-of-use damages—damages in the sum of the fair market value of the property alone made the plaintiff whole.[174] Under all of these varia-

tions, courts reasoned that to permit additional loss-of-use damages would be tantamount to allowing double recovery.

Yet another assumption was that, in total-destruction cases, a plaintiff could immediately replace the destroyed property and, thus, did not suffer any loss-of-use damages.[175] The example of the horse drowning at Schenectady illustrates this belief. There, the court twice justified denying loss-of-use damages on the ground that it "appear[ed] the plaintiff could have purchased [a horse] at Schenectady as well as at Rome."[176] In fact, the court placed the burden on the plaintiff, stating that "[t]here is no evidence that he could not

careful proof which showed not only the possibility of profitable use but an actual contract for that use"); *McKnight v. Ratcliffe*, 44 Pa. 156, 169 (1863) ("But 'profits which *might* be made' from a mine, opens an indefinite and vague region, which each mind or imagination might indulge in visions as glittering as the caves of Aladdin, or be depressed with the idea of entire worthlessness. There would be no limit to speculation, and to illustrate this is the object of the extreme figure we have used. 'The profits that might be made!' These would depend on a thousand contingencies.").

172. *See, e.g., Riddell v. Mays*, 533 S.W.2d 910, 911 (Tex.Civ.App.–Waco 1976, writ ref'd n.r.e.) ("The reason for not allowing damages for loss of use when the chattel is totally destroyed is because such damages are included as a part of the award for total loss[.]"); *Fort Pitt Gas Co. v. Evansville Contract Co.*, 123 F. 63, 64 (3d Cir.1903) (applying Pennsylvania law, stating: "The instruction [that plaintiff was entitled to the value of a dredge plus its rental value after destruction] was erroneous, because the rule it prescribed for ascertainment of the amount of the recoverable damages involved the award of two-fold compensation for the same loss. The right to use the dredge was incident to its ownership, and therefore compensation for its destruction, which of course extinguished the ownership, would necessarily be compensative of the consequent deprivation of its use."); DOBBS, LAW OF REMEDIES (1st) § 5.11, at 384–85 ("There was probably some thought

that the market value of the chattel—which reflected the right to use it gainfully—plus interest for the time the owner was deprived of it, actually furnished full compensation.").

173. *See, e.g., Edwards v. Beebe*, 48 Barb. 106, 108 (N.Y.Sup.Ct.1865) ("Besides, the allowance of interest on the value of the horse would seem to cover this very item, as it is substantially the same thing whether the plaintiff is allowed for the use of the horse or the money value of the horse.").

174. *See, e.g., Hayes Freight Lines v. Tarver*, 148 Ohio St. 82, 73 N.E.2d 192, 193 (Ohio 1947) ("The reason for this rule is that in the recovery of the full value of the vehicle, as of the date of its destruction, the owner has been made whole."); *McCurdy v. Union Pac. R.R.*, 68 Wash.2d 457, 413 P.2d 617, 624 (Wash. 1966) (same); *Kintner v. Claverack Rural Elec. Coop., Inc.*, 329 Pa.Super. 417, 478 A.2d 858, 861 (Pa.Super.Ct.1984) (same).

175. *See, e.g., Cecere v. Harquail*, 104 A.D.2d 6, 481 N.Y.S.2d 533, 534 (1984) ("The rule [was] based on the assumption that because the owner can replace the destroyed chattel immediately he suffers no loss beyond its value[.]"); *Morrison v. Campbell*, 431 S.W.3d 611, 615 (Tex.App.—Fort Worth 2014, no pet.) (explaining one assumption as "when property is totally destroyed, it can be replaced immediately with no loss of use").

176. *See Edwards*, 48 Barb. at 108.

have bought another horse at Schenectady[.]" [177]

Finally, while all of these assumptions played roles in the early movement against loss-of-use damages in total-destruction cases, perhaps the greatest influence on the development of that prohibition was the creation of common law on this issue in the United States. Time and again, many of these early cases took a monkey-see-monkey-do approach, replacing independent reasoning with string citations to earlier cases and treatises without further elaboration.[178] Indeed, it was not uncommon to see the entire disposition of the damages issue consist of a one-sentence version of the prohibition—plaintiff cannot recover the value of the loss of use of totally destroyed property—followed by a string citation.[179] Thus, whatever the early assumptions or extensions of trover, the development of the common law appears to have sustained the prohibition throughout the United States.

### C

Since the mid-twentieth century, however, there has been a sea change in both caselaw and legal treatises on the availability of loss-of-use damages in total-destruction cases. The result is a clear consensus that loss-of-use damages *are* available in total-destruction cases.

### 1

In assessing the current jurisprudential landscape on this question, we are mindful not only of the substantial number of courts that have permitted loss-of-use damages in total-destruction cases, but also of the consistently uniform *reasons* these courts have expressed for doing so.

The numbers are compelling. By our count, sixteen high courts around the country and the District of Columbia Court of Appeals have held that loss-of-use damages are available in total-destruction cases.[180] This principle has been affirmed

177. *See id.*

178. *See, e.g., Barnes v. United Rys. & Elec. Co. of Baltimore*, 140 Md. 14, 116 A. 855, 856 (Md.1922) (stating only "the ruling was correct, because if the plaintiff recovers the full value of the automobile, as for complete destruction, he cannot also recover the value of the use," followed by a string citation); *Latham v. Cleveland, Cincinnati, Chi. & St. Louis Ry.*, 164 Ill.App. 559, 563 (Ill.App.1911) (stating only "[i]f the property cannot be repaired then the measure of damages is the difference between the market value of the property before the injury and the value of the wreckage," followed by the citation *"Crossen v. C.J. & E. Ry. Co.*, 158 Ill.App. 42, and cases cited"); *German v. Centaur Lime Co.*, 295 S.W. 475, 476 (Mo.Ct.App.1927) (stating only "where plaintiff recovers for the full value of the automobile as for a complete destruction, he cannot also recover the value of the use thereof," followed by a string citation).

179. *See, e.g., id.*

180. *See Ex parte S & M, LLC*, 120 So.3d 509, 515–16 (Ala.2012); *Alaska Constr. Equip., Inc.*

*v. Star Trucking, Inc.*, 128 P.3d 164, 169 (Alaska 2006); *Stevens v. Mid–Continent Invs., Inc.*, 257 Ark. 439, 517 S.W.2d 208, 209 (Ark. 1974); *Reynolds v. Bank of Am. Nat'l T. & S. Ass'n*, 53 Cal.2d 49, 345 P.2d 926, 927 (Cal. 1959); *Gamble v. Smith*, 386 A.2d 692, 694–95 (D.C.1978); *Fukida v. Hon/Hawaii Serv. & Repair*, 33 P.3d 204, 210–11 (Haw.2001); *Long v. McAllister*, 319 N.W.2d 256, 261 (Iowa 1982); *Peterson v. Bachar*, 193 Kan. 161, 392 P.2d 853, 857 (Kan.1964); *Louisville & Nashville R.R. v. Blanton*, 304 Ky. 127, 200 S.W.2d 133, 138 (1947); *Weishaar v. Canestrale*, 241 Md. 676, 217 A.2d 525, 530–31 (Md.1966); *Gateway Foam Insulators, Inc. v. Jokerst Paving & Contracting, Inc.*, 279 S.W.3d 179, 184–85 (Mo.2009); *McPherson v. Schlemmer*, 230 Mont. 81, 749 P.2d 51, 53–54 (1988); *Chlopek v. Schmall*, 224 Neb. 78, 396 N.W.2d 103, 110 (Neb.1986); *Roberts v. Pilot Freight Carriers, Inc.*, 273 N.C. 600, 160 S.E.2d 712, 717 (N.C.1968); *DTS Tank Serv., Inc. v. Vanderveen*, 683 P.2d 1345, 1347 (Okla. 1984); *Checker Leasing, Inc. v. Sorbello*, 181 W.Va. 199, 382 S.E.2d 36, 37–38 & n. 1 (W.Va.1989) (citing *Jarrett v. E.L. Harper &*

by lower appellate courts in at least six other jurisdictions as well, including Florida, Indiana, Louisiana, New York, Tennessee, and Washington.[181] Federal courts applying Colorado, Pennsylvania, New Jersey, and South Dakota law have likewise permitted loss-of-use damages in total-destruction cases.[182] Even a New Mexico appellate court, before holding that it was bound by its understanding of New Mexico supreme court precedent to enforce the prohibition, acknowledged that the "position that loss of use damages are available for destroyed property to the same extent as reparable property does seem to be the trending modern rule."[183]

But even beyond the impressive number of courts that have endorsed the availability of loss-of-use damages in total-destruction cases, the near uniformity in the reasoning underlying these decisions is particularly persuasive. The reasoning may be properly viewed in terms of two interrelated arguments.

The first argument is that any distinction between partially destroyed and totally destroyed personal property for purposes of loss-of-use damages is unpersuasive. As the Supreme Court of California put it, "There appears to be no logical or practical reason why a distinction should be drawn between cases in which the property is totally destroyed and those in which it has been injured but is repairable[.]"[184] The Supreme Court of Iowa made that point more directly when it stated that "[l]oss of use damages will be incurred as readily when a vehicle is totally destroyed or when it cannot be restored by repair to its prior condition as when the vehicle can be restored by repair."[185] And it is that basic understanding that numerous courts have initially cited as justification for eliminating the distinction altogether.[186]

The second argument flows from the first and emphasizes that loss-of-use damages *must* be available in total-destruction cases pursuant to the principle of full and

*Son, Inc.,* 160 W.Va. 399, 235 S.E.2d 362, 399 (1977); *Cato v. Silling,* 137 W.Va. 694, 73 S.E.2d 731, 734 (W.Va.1952)); *Nashban Barrel & Container Co. v. G.G. Parsons Trucking Co.,* 49 Wis.2d 591, 182 N.W.2d 448, 453–55 (Wis.1971).

181. *See Wajay Bakery, Inc. v. Carolina Freight Carriers Corp.,* 177 So.2d 544, 546 (Fla.Dist. Ct.App.1965); *N.Y. Cent. R.R. v. Churchill,* 140 Ind.App. 426, 218 N.E.2d 372, 377 (Ind. Ct.App.1966); *Whitehead v. Kansas City S. Ry.,* 758 So.2d 211, 221 (La.Ct.App.1999); *Allanson v. Cummings,* 81 A.D.2d 16, 81 A.D.2d 1031, 439 N.Y.S.2d 545, 548 (N.Y.App.Div. 1981); *Tire Shredders, Inc. v. ERM–N. Cent., Inc.,* 15 S.W.3d 849, 857 (Tenn.Ct.App.1999); *Straka Trucking, Inc. v. Estate of Peterson,* 98 Wash.App. 209, 989 P.2d 1181, 1183–84 (1999).

182. *See Buchanan v. Leonard,* 127 F.Supp. 120, 122–23 (D.Colo.1954) (applying Colorado law); *Guido v. Hudson Transit Lines,* 178 F.2d 740, 742 (3d Cir.1950) (applying New Jersey law); *Dennis v. Ford Motor Co.,* 471

F.2d 733, 735–37 (3d Cir.1973) (applying Pennsylvania law); *Knapp v. Styer,* 280 F.2d 384, 390–91 (8th Cir.1960) (applying South Dakota law).

183. *See Behrens v. Gateway Court, LLC,* 311 P.3d 822, 828 (N.M.Ct.App.2013).

184. *Reynolds,* 345 P.2d at 927.

185. *Long,* 319 N.W.2d at 259.

186. *See, e.g., Alaska Constr. Equip., Inc. v. Star Trucking, Inc.,* 128 P.3d 164, 168 n.22 (Alaska 2006); *Ex parte S & M, LLC,* 120 So.3d 509, 513–15 (Ala.2012); *DTS Tank Serv., Inc. v. Vanderveen,* 683 P.2d 1345, 1346 (Okla.1984); *Bos v. Dolajak,* 167 Mont. 1, 534 P.2d 1258, 1262 (1975); *Fukida v. Hon/Hawaii Serv. & Repair,* 33 P.3d 204, 210 (Haw. 2001); *Chlopek v. Schmall,* 224 Neb. 78, 396 N.W.2d 103, 110 (Neb.1986); *see also Stevens v. Mid–Continent Invs., Inc.,* 257 Ark. 439, 517 S.W.2d 208, 209 (1974) (stating that there is "no logical reason" for the distinction).

fair compensation. The courts' articulations of this argument vary in word, but not in effect. For example, the Supreme Court of Missouri justified allowing loss-of-use damages because "lost profits may be necessary to accomplish fully compensating the claimant for his loss."[187] Similarly, the Supreme Court of Iowa explained that "[j]ust as loss of use damages are necessary for full compensation when the vehicle can be restored to its prior condition, they are warranted when the vehicle is destroyed or cannot be so restored."[188]

The modern trend, therefore, is both quantitatively and qualitatively persuasive: A substantial number of jurisdictions hold that the principle of full and fair compensation requires the availability of loss-of-use damages in total-destruction cases just as in partial-destruction cases.

## 2

Recent legal treatises have also followed suit. *Harper, James and Gray on Torts* contains one of the more blunt assessments of the early prohibition of loss-of-use damages and the movement away from it. The authors of that treatise acknowledge that "[w]here the article is wholly destroyed or where repairs are not practicable, however, most courts, until recently, have refused to allow any recovery for lost use."[189] To that trend, the authors remark, "Such blanket refusal scarcely seems justified."[190] Echoing the practical conclusions of the high court decisions we

discussed above, the authors approvingly note that "[i]ncreasingly it has become recognized that the principle of compensation [for loss of use] demands recompense in the one case [of total destruction] as in the other [case of partial destruction.]"[191]

Many treatises have eliminated altogether the distinction between partial-destruction and total-destruction cases when discussing the availability of loss-of-use damages. Dan Dobbs's *Law of Torts* treatise, for example, explains that consequential damages such as lost profits may be available where "the property cannot be used during the repair or replacement period."[192] Similarly, in Dobbs's *Law of Remedies* treatise, he states that "[t]he owner who uses a chattel in the production of income is always entitled to claim profits lost when the chattel is unavailable during a reasonable period for repair or replacement as a result of tortious destruction, damage, or conversion."[193] Professor John Fleming's treatise likewise explains the availability of loss-of-use damages without a distinction based on the amount of damage: "In case of damage or destruction of a profit-earning object, the plaintiff may claim either for loss of profits or for the cost of a substitute pending repair or replacement."[194]

But it is perhaps the *Restatement (Second) of Torts* that best captures this change in the law. As discussed above, section 927 in the *Restatement (First) of Torts* permits a plaintiff whose personal

---

187. *Gateway Foam Insulators, Inc. v. Jokerst Paving & Contracting, Inc.*, 279 S.W.3d 179, 184 (Mo.2009).

188. *Long,* 319 N.W.2d at 259.

189. Harper, James and Gray § 25.7, at 674.

190. *Id.*

191. *Id.*

192. *See* 2 Dan B. Dobbs, The Law of Torts § 379, at 1056 (1st ed. 2001); *see also* 3 Dan B. Dobbs et al., The Law of Torts § 481, at 22 (2d ed. 2011).

193. Dobbs, Law of Remedies (2d) § 5.15(2), at 876–77.

194. John G. Fleming, The Law of Torts ch. 9, at 233 (5th ed. 1977) (footnote omitted).

property was totally destroyed to recover the value of the property at the time and place of destruction, but it requires the plaintiff to choose between interest on that value and loss-of-use damages.[195] The *Restatement (Second) of Torts* fundamentally changed that recovery scheme. Section 927 now provides, in relevant part:

(1) When one is entitled to a judgment for the conversion of a chattel or the destruction or impairment of any legally protected interest in land or other thing, he may recover . . .

    (a) the value of the subject matter or of his interest in it at the time and place of the conversion, destruction or impairment; . . .

(2) His damages also include:

    (a) the additional value of a chattel due to additions or improvements made by a converter not in good faith;

    (b) the amount of any further pecuniary loss of which the deprivation has been a legal cause;

    (c) *interest from the time at which the value is fixed; and*

    (d) *compensation for the loss of use not otherwise compensated.*[196]

Contrary to the earlier version of section 927, this version plainly permits a plaintiff to recover *both* prejudgment interest on the fair market value of the property *and* loss-of-use damages. Further, a comment to section 927 explains the reason behind the enactment of section 927(2)(d):

There are, however, cases in which the loss of use is not otherwise compensated. . . . [One] type of case is that in which the plaintiff is unable promptly to find a replacement for the chattel on the market and is deprived of use during the period of delay. The loss of that use is not made good by a subsequent purchase and it is therefore compensable.[197]

The *Restatement,* therefore, sets up a far more generous recovery regime for total-destruction cases than previously existed, bringing the *Restatement* in line with the majority of jurisdictions that likewise permit loss-of-use damages in total-destruction cases.

### IV

∎ We agree with this modern trend, and we now hold that the owner of personal property that has been totally destroyed may recover loss-of-use damages in addition to the fair market value of the property immediately before the injury.

∎ We conclude our discussion the way we began it—with the guiding principle of Texas tort law: *"The thing to be kept in view is that the party shall be compensated for the injury done."* [198] Total-destruction cases are no exception. To be sure, compensation for the value of personal property may differ depending upon whether the property was partially or totally destroyed. But that is a *direct-*damages question, not a *consequential-*damages question. The consequential-damages inquiry here is concerned with a different injury wholly independent of the measure of property damage. This inquiry seeks to make whole a plaintiff who has suffered economic injury that flows naturally, but not necessarily, from the loss of personal property. Indeed, this inquiry turns not on the nature of destruction, but on the nature of deprivation. And, as

---

**195.** *See* RESTATEMENT (FIRST) OF TORTS § 927.

**196.** RESTATEMENT (SECOND) OF TORTS § 927 (emphasis added).

**197.** *Id.* § 927 cmt. o.

**198.** *Luna v. N. Star Dodge Sales, Inc.,* 667 S.W.2d 115, 119 (Tex.1984) (quoting *Craddock v. Goodwin,* 54 Tex. 578, 588 (1881) (emphasis added)).

many of our sister courts have convincingly held, it is by compensating a plaintiff for loss-of-use damages incurred during the period of deprivation—a period reasonably necessary to obtain replacement property—that the principle of full and fair compensation is satisfied.[199]

■■■■ Permitting loss-of-use damages in total-destruction cases, however, is not a license for unrestrained raids on defendants' coffers. As with all consequential damages, the availability of loss-of-use damages is necessarily circumscribed by commonsense rules. To begin with, the damages claimed may not be "too remote."[200] This is not to say they must be "the usual result of the wrong," but they must be foreseeable and directly traceable to the tortious act.[201] The damages also must not be speculative.[202] Although mathematical exactness is not required, the evidence offered must rise above the level of pure conjecture.[203] Moreover, the damages may not be awarded for an unreasonably long period of lost use. Whether framed as a duty of mitigation or a doctrine of avoidable consequences, the principle is the same: A plaintiff may not recover loss-of-use damages for a period longer than that reasonably needed to replace the personal property.[204] That principle compels a plaintiff's diligence in remedying his loss and deters an opportunistic plaintiff from dilly-dallying at the expense of the defendant. After all, the role of actual damages is to place the plaintiff in his *rightful* position, not the position he *wishes* to acquire.

\* \* \*

■■■■ Applying those principles to the facts of this case, we find that the trial court did not abuse its discretion in submitting the loss-of-use-damages question

**199.** We recognize that one may construe a plaintiff's recovery as double recovery where he receives the fair market value of his property and loss-of-use damages plus prejudgment interest on that total. Indeed, we have said before that prejudgment interest itself is compensation allowed by law as additional damages for lost use of the money due as damages. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex.1998). On that understanding, one might conceivably view prejudgment interest and loss-of-use damages as redundant forms of compensation for the same harm. *See Alaska Constr. Equip., Inc. v. Star Trucking, Inc.*, 128 P.3d 164, 170 (Alaska 2006). We reject that view, however, because of the distinction we have described between direct damages, such as the lost value of totally destroyed property, and consequential damages, such as the loss-of-use damages incurred during the reasonable time necessary to replace that property. The owner will always (necessarily) incur the former in all total-destruction cases, and fair compensation for those direct damages requires payments for what the owner has lost, as of the date of the loss, plus prejudgment interest. Loss-of-use damages are separate and may not be sustained at all, but if they are, fair compensation requires payment for those losses as well as of the date the owner incurs them, also with prejudgment interest on that amount. And in any event, we are bound by the Legislature's command that "[a] *judgment* in a ... property damage case earns prejudgment interest." TEX. FIN. CODE § 304.102 (emphasis added). Prejudgment interest, therefore, is statutorily required on a judgment that includes compensation for both fair market value and loss-of-use damages.

**200.** *Arthur Andersen & Co. v. Perry, Equip. Co.*, 945 S.W.2d 812, 816 (Tex.1997) (citing *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex.1983); *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 164 (Tex. 1992) (Phillips, C.J., concurring)).

**201.** *See id.*

**202.** *Id.* (citing *White*, 651 S.W.2d at 262; *Bynum*, 836 S.W.2d at 164 (Phillips, C.J., concurring)).

**203.** *See id.*

**204.** DOBBS, LAW OF REMEDIES (2d) § 5.15(1), at 875.

to the jury and did not err in denying AAIC's JNOV motion. As the trial court understood, Texas law permits loss-of-use damages in total-destruction cases. Because AAIC has only appealed the narrow legal question presented and has not challenged on appeal the jury charge or the amount of the damages award,[205] we decide only that narrow question. We therefore reverse the court of appeals' judgment, and render judgment for J & D.[206]

---

**205.** For the first time in this litigation, AAIC contended at oral argument before this Court that a remand was necessary to determine the proper amount of loss-of-use damages. That was the entire reason for submitting the question to the jury, yet AAIC refused to engage in the trial court, choosing instead to attack only the legal availability of loss-of-use damages. A party cannot ignore a squarely presented issue in hopes of winning on another issue on appeal, and then reasonably expect to return to the trial court for a second bite at the apple after an unsuccessful post-judgment appeal. By failing to object to the amount of the award, AAIC has waived this argument. *See* Tex. R. App. P. 33.1.

**206.** The court of appeals technically reserved for consideration the third issue raised in AAIC's brief in the court of appeals—namely, whether J & D could recover under the AAIC policy "where its legally recoverable damages do not exceed the limits of the tortfeasor's liability coverage." 446 S.W.3d 41, 47 n. 9;

Appellant's Br. iii. The two-page argument on that issue was a recycled version of the purely legal argument AAIC presented to this Court and fails for the same reason. AAIC's position was that Brueland was not "underinsured" because her insurer paid more ($25,-000) than the value of J & D's truck ($19,500) and because J & D is not entitled to loss-of-use damages. As we have demonstrated above, the premise of that argument is incorrect—J & D *is* entitled to loss-of-use damages, the sum of which, in addition to the value of the truck, exceeds Brueland's $25,000 policy limit. Consequently, Brueland was underinsured, triggering AAIC's obligation to pay. *See Stracener v. United Servs. Auto. Ass'n,* 777 S.W.2d 378, 380 (Tex.1989) ("[A] negligent party is underinsured whenever the available proceeds of his liability insurance are insufficient to compensate for the injured party's actual damages."). There is, therefore, no reason to remand for consideration of this issue.